Thank you. If it may place the court on John Hayes, appearing for the appellant Victor Huezo. What I would like to do is focus on the reliance issue. The bankruptcy court found fraud. Reliance is one of the factors. We know that it has to be justifiable reliance. But for sure, it has to be reliant. There has to be reliance on the statements that were allegedly false. That's determined on a case by case basis. I understand. But I don't think I think it's clear myself anyway that there was no reliance at all. Mr. Mr. Hayes. Sorry. I'm sorry. I see. Can I ask you a sort of a gating question? Sure. I realize that you want to focus on reliance and I and I applaud your your strategic sense of that. In your mind, is that entirely a factual question? So we're looking for a clear error. Is it some sort of a mix of law and fact or do you think it's a legal question? Well, I think it's at least a mixed question. And I'll and it's possibly de novo issue of law, because the facts that I was going to discuss come entirely from Mr. Ball. We're accepting what he said. We're accepting what he looked at. We're accepting what he says that he did in response to the information he was given. So we're not asking you to to retry the credibility of Mr. Ball. If we take what he said he did, he what he wanted was 15 percent interest. He knew they were hard money loans. He knew they were being made to creditors. I mean, to borrowers who couldn't get a loan from the bank. He's a relatively sophisticated businessman. This isn't some retired teacher that's, you know, investing in his IRA. So just to finish answering your questions, I think the facts that show that we should have won are not in dispute. So if I might call up and I did want to start with just a real quick sum. You know, the trial, which, by the way, was five and a half years ago. Now, the entire trial was Mr. Ball's testimony. And he had this expert, but all the expert did was talk about how the payments were allocated. So in the brief says there were there were numerous witnesses that there was only his testimony. He invested a million, almost a million dollars in by making loans over four months, 15 percent interest in a booming market. So what information did he have? And again, this is from him. His testimony, he testified that he had five or six conversations with Mr. Weibo all on the golf course, although one of them might have been in a restaurant. That's his testimony. He had he got these instructional materials, which are 12 or 14 pages. And, you know, there's a couple of forms in there and a little bit of general information. There's no financial information whatsoever. Mr. Ball testified he did. He looked at them. He didn't ask any questions. He didn't go over them with Mr. Weizel. He got these two investor activity reports. So there were four loans, but there were only two investor activity reports for the first two. Again, he said he didn't really look at them. He just signed them. And he obviously just signed them because one place on the form says, I acknowledge that I looked at these borrowers credit and I approved the credit. I mean, he obviously didn't do that. You make the couldn't you interpret all that the other way and say that that all reinforces the idea that this individual was trusting your client. He was expecting your client to basically do that grunt work for him. Oh, absolutely. I believe he stated that a couple of times when he was. But isn't that reliance? Isn't that reliance? No, I think that's the opposite of reliance. When they went. And that could be enough. I accept that it's possible for justifiable reliance to be. Well, I just trusted the guy. It's possible that that's enough. I accept that. But if justified. But when when when the question is, what did you do about something? Nothing. I just I just trusted what this guy told me. When we when we're in the realm of justifiable reliance, we are entitled to look at a relationship and we're entitled to look at some subjective factors. So my sense of this has always been that what we're looking for to get out of justifiable reliance is something that's just such a big red flag that you can't ignore. There's no obligation to do an investigation. But if something is such a red flag, that's kind of a stop the presses moment. And I think what you're arguing is more cumulative that, you know, this sort of just didn't make any sense. So therefore, he shouldn't have. And in my view, that's a different argument from what the cases are telling us. So tell me, tell me how you reconcile those. Yes. This judge Kwan commented that there was this long familiar relationship. But if you go back and look at the testimony of Mr. Ball, he knew Mr. Weisel's brother from high school. He stated that he met him every year or two at Mr. Kwan's tire shop when they got new tires. And that was the extent of his relationship with the brother. He admitted that he didn't know Victor from Adam until they started playing golf together, which was several months. So there's no long familial familial relationship, which could be a factor in whether or not as well. I just trusted him as enough. Right. The. I have a second comment to that. The idea of justifiable reliance could be I just trusted the guy. Oh, I remember you said that these red flags and and I and I accept that there was no. I mean, I guess you could say there was no giant red flag. But what we have is a gentleman that he basically just met. He played golf with a few times. He saw he saw he's a relatively sophisticated businessman. He saw 15 percent interest in a growing market. It looked foolproof. He jumped on it. And well, why didn't you jump on that? Well, I just believe Mr. Wade. So that that's that can't be justifiable reliance, in my opinion. So so you're not so much challenging the finding of reliance. In fact, you're challenging whether that reliance was justifiable. Do I have that right? Oh, I have no idea that he didn't rely on anything that he saw the 15 percent in 2007. You know, houses were were going up 10 percent, 5 percent per month. And this is a great way to make money. How? Where do I get in? I met this guy on the golf course. He seems like he knows what he's doing. He never got any financial information. Why? Well, I trust you. Isn't that reliance, in fact, as opposed? Well, I don't we've been over that. I think there's two different things here. Well, there's there's one case. I mean, I forget the name offhand. And the interest was one hundred ninety percent, which is more than 15. But the court said, well, obviously, based on the interest alone, the guy, they didn't they didn't rely on anything other than. You can't really argue that if it's too good to be true, it's got to be, you know, fraud. I mean, that that isn't going to work for you here. You say in your document that that, you know, he was anticipating improperly anticipating a no risk loan. But wasn't that when we get to you're only arguing reliance here before us. But the assertion is that there was fraud. And no matter what reliance we assume, he he was assuming that he wasn't going to be defrauded. He was assuming that he was getting the right facts. So this was about whether it was a bad investment. I, I hear everything you're saying. You know, I don't think he could sue him for negligence, for example, because give me a break. But the the the what he did was he relied on statements, including that some of the loans were secured. All of them were secured. Things that were just patently untrue. He he relied on the fact that he was going to only use the money for certain purposes. Not true. And if we if we assume that those actual findings are correct, what does that do to your argument? But, you know, he assumed that based on what I mean, based on a conversation wandering around a golf course and documents that were so contradictory that it's not reasonable to rely on them at all. And Judge Kwan made a specific finding that the that the statement that his belief that the loans were secured was not well taken. Judge Kwan made that specific finding. You know, I want to reserve if I could. If you may reserve the remainder of my time. Thank you. Thank you. All right. Thank you, Your Honors. Just starting with the standard review. I really don't see that there is any any point in mucking up what is one of the classic classically cleared doctrines of appellate review when it comes to trials that have been conducted in in trial courts and bankruptcy courts, which is essentially substantial evidence. Clear air standard review. That's what applies here in terms of who testified at trial. The trial was actually conducted in terms of the direct testimony came in terms of the declarations. But as one of the panelists pointed out, the. The legal standard for justifiable reliance takes into account both objective and subjective components. And one of the most important objective components here is that Mr. Weasel went out of his way in order to project a high level of probity and honesty and more importantly, success. Mr. Weasel paid returns to Mr. Ball year after year on his investments. He provided very specific activity reports that turned out for the most part not to be true. But in certain in certain senses, Mr. Some of the things Mr. Weasel told Mr. Ball were actually true, which which gave his fraudulent conduct this cloak of plausibility. For instance, Fremont did have a lighting lending license. Fremont did appear to be making loans. Fremont did appear to be a successful ongoing operation. Mr. Weasel did have a background in finance and banking that Mr. Ball did not. Mr. Ball is a high school graduate who operates the tanning salons. He is not a sophisticated investor by any means. In any event, this debate over these factual issues is essentially a really litigation of the facts that the bankruptcy court tried and made determinations about. For the most part, his bankruptcy court's determinations were against Mr. Weasel. On one of the loans, he he agreed with Mr. Weasel that there wasn't sufficient evidence of fraud. But essentially, Mr. Hayes is now in a position of attempting to retry these issues to this court when the bankruptcy court already tried these issues and made not only factual determinations, but also credibility determinations. I have a question about the credibility determinations because, and I have to ask this, this took forever. There's a trial, and I'm in my courtroom, so I'm looking at my witness box, and I see a person and I form an impression. And then I rule on it, and I think those credibility determinations can and should be given incredible deference. How many years between seeing the testimony and making the determination went by? It was quite a long time, Your Honor. I think it was a few years. Three? Two? I'm not exactly sure the number of years, Your Honor, because... But it was a long time. Yes. Does that have any impact? I mean, I'm not sure it does. As a matter of law, the general rule is that we give great deference. Do we have to take into account that the determinations, at least as they were recorded, this was an unusual case, particularly as to the fourth loan, that they were done substantially after the time of trial? I don't think the time lapse in this case is consequential. For the simple reason that the reason Judge Kwan changed his mind about one of the loans didn't have anything to do with credibility per se. It had to do with his re-evaluation of the documentation. It's slightly ironic that the reason why he didn't find the third loan to be 523A2A-ish is because of the amount of time between that loan and the testimony and the trial, and the only thing that supported it was some testimony that Judge Kwan specifically didn't find credible because of the amount of time. Right? I mean, if you apply that to the rest of the judgment, that raises some questions, I think. Well, Your Honor, I would say that it's right to ask the questions, but I think the answer is clear. And the answer is you ultimately have to go back to deciding whether the amended final judgment is supported by substantial evidence. And that's still the substantial evidence test. And Judge Kwan had a perfect right to change his mind on that particular issue before he actually issued a final judgment. And when Judge Kwan looked at the evidence, he determined properly, I believe, that the documentation led to a conclusion that Mr. Ball justifiably lied as to the other loan as well. So I believe the unusual procedural posture of the case and the amount of time it took, I don't believe, affects the result. And I think to some extent it's a testimony to how seriously Judge Kwan took the issues and how much time he spent. He went through this record very carefully. He was very careful in pointing out exactly what evidence he relied on in making determinations of reliance and the other elements of the fraud claim. But if you take the totality of the evidence here as to each of the loans that the court found were not dischargeable, it's impossible to say that what happened was error, let alone clear error. Because you not only have a lot of documentation that Mr. Hueso went out of his way to imbue with a certain amount of polish and professionalism, but you also have the subjective factors. And one of the things that Mr. Hueso made sure to do was to give Mr. Ball these glossy promotional materials that purportedly walked him through exactly how he was going to get his money back. And year after year, that seemed to be bearing fruit. It seemed to be happening exactly as Mr. Hueso had represented initially. So the totality of the evidence is more than substantial to support the judgment. And for that reason, I would say unless there are any questions, I would ask for an affirmance on that ground. Okay. I have a question for you about some math, if that's okay. Yes, Your Honor. Well, I bet you were, because I think you candidly said in your brief that there appears to be a question that might require the bankruptcy court to do a little more fine-tuning on remand. And if I'm understanding correctly, the font of this is the $29,000 or $30,000 payment that I don't think Judge Kwan took account of, perhaps because it hadn't been made yet or hadn't been brought to his attention. The appellant raises this, and to their credit, they don't really complain about it, because I think the assumption is you're going to agree that one way or the other, some $29,000 or so adjustment is going to be made. And I guess I will ask whether you agree with that. And if so, how do you think we would best facilitate that process for you? If there's going to be a stipulation or an agreement to raise satisfaction or judgment, maybe that's a way to do it. But first of all, I guess the question is, are you in agreement that there is another payment that's got to be calculated here before a judgment's going to be final? Yes, Your Honor. In all candor, I spent a lot of time going through the record and trying to, in my briefs, to give the court a clear understanding of what all this math was about, both on the prejudgment interest part and the overpayment. The overpayment is around $50,000. The opening brief that Mr. Hueso filed argues that it's a $50,000 number. I acknowledge that in my respondent's brief. In the reply brief on page 16, Mr. Hueso pegs the number at $100,000, but that number, I don't know where that number comes from. There are no record sites in the reply brief as to that issue. Can I make sure I'm following you? Because to me, it was two different issues. I think the math that Judge Kwan had in front of him resulted in a $50,000 overpayment, and then there's a question of to what that should have been applied. And your position is under the state statute, it should be applied first to unpaid interest. And Mr. Hueso would argue that, well, if it's applied to unpaid principal on the November amount, then I would be better off. But you would say that's not compelled. I'm talking about what I think is something discrete. And if it isn't, correct me, there's another $29,000, $30,000 that just wasn't part of Judge Kwan's calculus, correct? Or not? I don't – that's not something I'm cognizant of. The way I understood it, there was about $102,000 that was credited from the Chapter 7 estate of the entity, correct? Right. But, in fact, about $131,000 was actually received, correct? There's a $29,000, $30,000 delta there, and my understanding was that simply was – those numbers weren't exactly in front of Judge Kwan when he came up with his calculations, Ray, the judgment. So if I have that wrong, if it's not two different things, tell me, because otherwise it looks like that's just something else that's going to have to get figured out. Yeah. Okay. No, Your Honor, I was – what I was focusing on is the $50,000 overpayment that both sides agree on. As far as the $29,000 that Your Honor is mentioning, I'm not sure where the math on that comes from. I will tell you that the appellant, for example, pointed out, and I think in a footnote, although they don't argue about it, my sense was that's because everybody agreed there was another payment that was part of this and should have been part of the calculation, but Judge Kwan just didn't do it, perhaps because he wasn't aware of it at the time. Can we cut to the chase here? It sounds like you agree the number's a little off. Yes, Your Honor. There is no – based on this record, it's impossible to say that there's a final judgment amount that is mathematically correct. Okay. So that has to be worked out upon remand in some way or other. In my respondent's brief, I argued as a matter of professional pride as an appellate lawyer that this shouldn't be a reversal because there was no error committed because everyone kind of knew these things have to be worked out. But there has to be – the issue has to be resolved. We would vacate the – what you would say is you would agree that if we affirmed as to all the judge's findings, we would vacate the mathematical calculation and send it back for him to redo the math. That would be the proper disposition, Your Honor, yes. I guess we're also – we're also I guess inviting you to come up with a way in which we could avoid a remand, and maybe there's no way to do that. But if there is a suggestion in that regard, we're listening. I just don't see how that's possible, Your Honor, because the judgment is still accruing interest. So this math has to be worked out in one way or the other when it goes back down. Judge Kwong has some more work to do, and my client's bankruptcy lawyer has some more work to do. I was – as an appellate lawyer, I'm stuck with the record that I have, and I tried my best, but I have to acknowledge that. I very much appreciate your candor. Thank you. Yeah, and I do too. I mean, I think reading the brief, it was refreshing. It's refreshing that the appellate didn't take on every single issue and is really focused strategically on a few, and it's very refreshing that the appellee is acknowledging the math error, because those are things that we would be banging our heads against the desk trying to figure out ourselves. So, again, much appreciated. Thank you, Your Honor. This is exactly why I went to law school, and here I end up again. Unless there are any other questions, I'll just submit. All right. Any further questions? Thank you. Thank you very much for your argument. All right, Mr. Hayes, you have four minutes, almost your full five minutes. Great. Thank you, Your Honor. I wanted to, first of all, answer your question, Judge Taylor. The trial was April of 2014. The final ruling was September of 2019. That's five and a half years, which is shocking for a lot of reasons. But is it reversible error? I mean, maybe he just had really good notes of what his impressions were. Maybe he went back and listened to recordings. I mean, wouldn't it be dangerous for it to say, if you take too long, your findings don't get the same deference they'd get otherwise? Well, I think it is in this case as to the fact that he changed his mind on the fourth loan, which is by far the largest. In the initial, in his first memorandum, he found that the $404,000 loan was discharged because the reliance wasn't justifiable. And by the way, he didn't get any investor activity report. He didn't even get a promissory note when he made the fourth loan. In deciding to change his mind about that, Mr. Hayes, was he really reassessing credibility? Or was he saying, you know, there were some other documents that were before me, and I just didn't consider them. When I do consider them, I think there is a record on which I could find reliance. I think he was definitely, he clearly reassessed credibility. He did that based on documents that he apparently looked at a second time. And, you know, now we're three years later, he's reviewing the record again. But he said the reason the fourth loan is discharged is because there wasn't justifiable reliance. And that's what he changed his mind. But I get that he reassessed credibility in sort of a broad sense, but he didn't go back to the testimony and reassess the candor of witnesses. He didn't change his mind about who to believe. He changed his mind about what he should consider, because he hadn't considered some documents that were in front of him. Is that fair? You know, I hate to ask this. How can you tell? I mean, it's, listen, let me just leave it at that, yes. I did want to make one last, besides, I wanted to comment again on that $400,000 loan, the last one that he did change his mind on. You know, there was a couple, there was some e-mails. He relied on almost nothing. I mean, he got no documentation whatsoever before he wrote a check for $400,000, on which he was going to earn 15% interest. But the last comment, and I wanted to make one last pitch on why this isn't justifiable reliance. And that was to say that, you know, I don't play golf, but I played in a bankruptcy lawyer's golf tournament for several years. That's not golf. That's it. It certainly wasn't what I was doing. One year I couldn't even find my golf clubs the morning that I was. Anyway, I was just sort of imagining while I'm listening, actually, that if I was put in some group and there's some bankruptcy lawyer that I know, or somebody else in the group, and I say, boy, you know, would you like to loan me $800,000? Loan my corporation $800,000. I'll pay you 15% interest. The person would, you know, look at me like you're crazy for one thing. But the second thing they'd say is, well, send me the documentation. And I think anybody looking at this documentation would say, well, at least give me more documentation before I make a decision on whether to make this huge loan. And if the person said, oh, you're John Hayes, all right, I trust you. Who do I make the check out to? That is not justifiable reliance. That's what this comes down to. And I'll leave it at my dramatic end. Thank you. Thank you. That was dramatic. I like that. All right. Thank you very much for your good arguments. This matter will be deemed submitted. Your Honor. Thank you.
judges: Taylor, Faris, Lafferty